Mr. Justice Scott delivered the opinion of the Court. The appellant was indicted for murder, and upon plea of not guilty and trial by jury, he was found guilty of murder in the first degree ; and after the overruling of a motion for a new trial and exceptions, he was sentenced to death, no motion in arrest of judgment having been made. The case having been brought here by appeal, is presented in the same aspect as if it had come up on error; and by the operation of a humane principle applicable, in general, to criminal cases, and especially to those where life is involved, the convicted is to be considered as standing upon all his legal rights, that he has not expressly waived of record, or that have not been taken away by the statute. (Dig. 402, sec. 98.) And it is therefore that we have before us not only the action of the court below in refusing the motion for a new trial, but all questions that might have been raised upon the record by motion in arrest oí judgment; any thing in the case of Waller et al. vs. The State, (4 Ark. 87,) to the contrary notwithstanding. But that case did not go the length of holding a motion for a new trial in a criminal case a waiver of all errors in the record not embraced in the motion, but simply that its effect was to cut out all exceptions that had been put m during the progress of the trial. As the record in the case at bar does not disclose the instructions given by the court to the jury, no question as to misdirection is presented, and in reference to the verdict then we have only to inquire whether it was without evidence or so much against the evidence as to come within the rule as laid down in the case of Drennen vs. Brown, (5 Eng. 138.) To do this we must necessarily first look to the nature of the crime found before we can determine whether or not the evidence authorized its finding. Murder in the first degree, as defined by our statute, is of clear apprehension in the light of several judicial expositions of statutes substantially like our own. Among these the case of The Commonwealth vs. Jones (1 Leigh 598,) approved in The Commonwealth vs. Hill, (2 Gratton 594) and The Commonwealth vs. Whitfield, (6 Randolph 721,) are conspicuous; and the Pennsylvania and some of the Tennessee decisions show scarcely less light. Not only is all murder which shall be perpetrated by means of poison, or by lying in wait, or which shall be committed in the perpetration, or in the attempt to perpetrate arson, rape, robbery, burglary or larceny, murder in the first degree, but any other kind of wilful, deliberate, malicious and premeditated killing is also murder in the first degree. All other murder is murder in the second degree. The distinction between murder and manslaughter is not, however, in the slightest degree altered; nor is the nature or definition of murder in the least; both remaining as at common law, the statute but distinguishing one crime by two degrees in the same crime. In making this distinction the legislature have enumerated certain specific cases of malicious killing as constituting in themselves, respectively, the first degree of the crime, and conscious that a particular enumeration of all the cases that may happen in the ever varying circumstances in which men may be placed, equally deserving the same punishment, would be altogether impracticable, did, to meet this emergency, declare by general words, that not only these enumerated cases should be ranked in the first degree of murder, but also that any other murder that shall be perpetrated by any other kind of wilful, deliberate, malicious and premeditated killingshould also be of the same degree: and all murder, not being one of the specified cases and not being included in the general designation, should be murder in the second degree. The remarks of Judge William Daniel, in delivering the opinion of the General Court of Virginia, in the case of The Commonwealth vs. Jones, (1 Leigh 610,) presents this exposition so clearly and briefly that we shall extract them here at length. He says: “ The counsel for the prisoner has supposed and argued with great ability that the words ‘any other kind of wilful deliberate or premeditated killing’ ought to be construed and of necessity, as referring to the character or kind of killing or murder specified in the previous enumeration (by means of poison, lying in wait&c.) as if it read ‘any other kind of such wilful, deliberate or premeditated killing,’ because otherwise, as he supposes, the preceding particular enumeration would be useless. Now a plain and invincible answer to this argument is presented in the import of the terms used : other and such. Other killing means any other whatever, which is different from the same; such killing would refer to the modes of killing enumerated and confine itself to the kind of killing enumerated and the means by which it was effected. To admit this construction of the prisoner’s counsel would be to allow that the legislature meant nothing, or did not understand what it meant when it used, upon this important subject of life and death, these words of plain and obvious import “ any other kind of wilful, deliberate and premeditated killing.” This is what this court cannot admit. Poison may reach the life of one or more, not within the design of him who lays the bait; lying in wait may be with a view to great injury, abuse and bodily harm without the settled purpose to kill; imprisonment, or confinement or starving may be with a view to reduce the victim to the necessity of yielding to some proposed conditions as well as a punishment for the failure of prompt obedience, without any certain and fixed determination to destroy life; and the same may be said of malicious or excessive whipping, beating or other cruel torture. In all these enumerated cases the legislature has declared the law that the perpetrator shall be held guilty of murder in the first degree, without further proof that the death was the ultimate result which the will, deliberation and premeditation of the party accused, sought. And the same authority has declared the law that any other kind of killing, which is sought by the will, deliberation and premeditation of the party accused shall also be murder in the first degree; but that as to this other kind of killing proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought. But to this general rule the same authority adds an exception, which is, that any death consequent upon the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder in the first degree; and all other murder at common law shall be deemed murder in the second degree. So that the cases within the exception as now put and the cases enumerated as first mentioned, are, in fact, placed upon the same principle; there is no necessity of proof in either to establish the fact that the homicide was intended. And it follows of course that all other homicide, which was murder at common law, is now murder in the second degree, except when it shall be proved that the homicide was the result of a “wilful, deliberate and premeditated killing” and it follows of necessity that when by the proof the mind is satisfied that the killing was wilful, deliberate and premeditated, such killing must be taken and held to be murder in the first degree. This construction of the act of assembly is consistent with and supported by the decision of this court in Burgess' case, 2 Virginia cases 483 and Whitfield's case, 6 Randolph 721 In the light of these views and of this reasoning, in which we concur and which we regard as altogether satisfactory, it is clear to our minds that, when a given case of malicious homicide is not one of the cases specified in our statute, in the enumeration of the particular cases designated, as of themselves, murder in the first degree, then, in order to bring it under the general description and thus show it to be murder in the first degree, it is indispensible that the proof adduced shall be sufficient to satisfy the minds of the jury that the actual death of the party slain was the ultimate result sought by the concurring will, deliberation, malice and premeditation of the party accused. The distinctive feature of this particular class of cases of murder in the first degree being a wilful, deliberate, malicious and premeditated specific intention to take life. The inquiry then in cases of this class of murder in the first degree, must always be, was the killing wilful, deliberate, malicious and determined on before the act of killing. If it was, then that degree of malice -has superinduced the act that is necessary to make it rank in the highest grade of murder. It is indispensible then in such cases that the evidence should show that the killing with malice was preceded by a clearly formed design to kill — a clear intent to take life. It is not however indispensible that this premeditated design to kill should have existed in the mind of the slayer for any particular length of time before the killing. Premeditation has no definite legal limits, and therefore if the design to kill was but the conception of a moment but was the result of deliberation and premeditation, reason being upon its throne, that is altogether sufficient; and it is only necessary that the premeditated intention to kill should have actually existed as a cause determinately fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to aford time for reflection. Accordingly it was held in Virginia (6 Randolph 721) that when the accused, as he approached the deceased and first came in view of him at a short distance, then formed the design to kill, and walked up with a quick step and killed him without provocation then or recently so as to prevent time for reflection, it was murder in the first degree. Nor is it necessary to prove this formed design by positive evidence. Like any other fact it may be established by circumstantial evidence, which, beyond a rational doubt, convinces the mind of the jury that this previous determination to kill did in fact exist. A homicide often fails to declare his intention, but remains mute as to this : and notunfrequently veils his fatal purpose under the guise of friendship. The most wilful, deliberate, malicious and premeditated homicides would often go unpunished if his formed design to kill could not be proved by circumstances independent of any admissions of his, or even against his express declarations. The general rule of law, as to this point, is that a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act. (2 Stark. Ev. 738.) Accordingly if a man were to raise a gun, take aim and fire, and kill another, and these were all the facts proven, there could be no doubt but that he intended to kill; and this would be sufficient evidence to authorize the finding of that fact, and the law would intend that it was done with malice aforethought, and it would b & prima facie a case of wilful, deliberate, malicious, and premeditated killing to be disproved or confirmed by the proof of the other attendant circumstances. With this understanding of so much of the law as seems applicable to the case before us we will proceed to an examination of the evidence in order to determine whether or not the verdict and judgment are sustained. The death by the use of adeadly weapon withoutlegal excuse or sufficient provocation to reduce the killing to manslaughter is perhaps sufficiently shown by the testimony to have authorized a verdict of murder in the second degree; but is there sufficient evidence in the record to sustain the verdict actually found ? Is it satisfactorily shown that the prisoner maliciously killed the deceased in pursuance of an antecedent clearly formed design to take his life ? Several circumstances in proof seem to authorize the inference that he was in a condition of mind capable of reflection up to the moment of committing the act. After the prisoner drew the pistol and pointed it at the deceased, when told not to shoot by Tucker, he took it down, put it behind him under his coat, saying he would not shoot if Tucker said so. He then, according to the testimony of this witness, asked Stamps about a difficulty at Ozark. He also spoke in the same yielding way in reply to Silman, another witness, who told him to throw the pistol away, and also spoke to the deceased about the gun which he held in his hand. He does not seem to have manifested any high state of anger, or passion, or to have been under the influence of fear : and from his whole conduct and words as shadowed forth by the testimony it would seem not improbable that he was in a reasonable condition of mind and capable of reflection. He might have therefore actually deliberated and formed in his mind after premeditation the design to kill. - But the questions recur, did he in fact form in his mind such design to kill the deceased, and in pursuance thereof, executed it ? That he did so is prima facie shown by the act done and the means by which it was done: that is to say, by the killing with a deadly weapon. And somewhat as to this point is also shown by the manner in which the act of killing was done irrespective of the weapon used, as the evidence shows some caution and stealthiness in the manner of the attack — the prisoner seeming to seek to attack suddenly and when the deceased was unaware of it. He was also ready armed before the difficulty arose and although he had been told that the deceased had threatened his life, instead of avoiding him, he thrust himsetf into a quarrel between the deceased and another man, as if desiring a difficulty. After the deceased had denied that he had taken hold of the gun with a view to draw it upon the prisoner, and, according to one witness (Doctor Tucker) after he had actually given up the gun to the brother of the witness, the prisoner did not seem disposed to be satisfied and cease to quarrel; but he then spoke of another matter of difficulty, an affair at Ozark; and after some angry words made this, according to Doctor Tucker, the pretext of the fatal attack. It is true that the other witnesses do not corroborate Doctor Tucker in these latter particulars; but nevertheless they differ from one another, both as to the manner of the attack and as to what immediately preceded it as much as they differ with this witness. But notwithstanding all the contradictory statements of the witnesses (and one of them, Hutchinson, contradicts himself in one particular and, as to the events that immediately precede the killing, is totally unsustained by any part of the balance of the testimony) there is nevertheless enough testimony to support the verdict; so that it cannot be said to be without evidence in any essential ingredient of the finding. When the evidence is weighed, however, and the circumstances in proof that are favorable to the defendant, are considered, we cannot say that the verdict is not against the weight of the evidence and is therefore not altogether satisfactory to our minds; yet this dissatisfaction is not of that violent grade to come within the rule to which we have referred, and authorize us to grant a new trial merely because we think the finding against the weight of the evidence. Although the prisoner used the pistol as a bludgeon and made no attempt to fire it either when making the attack or while in conflict with the deceased, still it was a deadly weapon used either way; and besides there is no positive testimony that it was in point of fact loaded, and this is only to be inferred from the statement of the prisoner that he would have shot the deceased when- he first drew the pistol if he had not been prevented. And the latter part of this statement is not corroborated, as there is nothing in the testimony to show that he was in fact prevented from shooting, when he drew out and pointed the pistol at the deceased, otherwise than by having been called upon by two of the witnesses and requested or ordered not to shoot. It is true also that as soon as the deceased called out to the by-standers to take the prisoner away, and thereupon being told by one of the witnesses to desist he readily and at once desisted. But this is not absolutely inconsistent with an intention to kill, because having .himself inflicted the blows upon a fallen adversary he may have been conscious that he had already effected his purpose and was therefore willing to desist. Admitting that Sil-man swore the truth (which we are not disposed to question at all; for in our opinion his evidence bears upon its face more of consistency and truth and less of prejudice and partiality than any one of the witnesses) the facts which he states as those which immediately preceded the attack and as to the manner of the attack, although strongly repellant of the proof indicating the existence of a formed design to kill, are by no means conclusive on the point; because it is not impossible but that the exclamation to the deceased that “ if he did not put down the gun he will givehim a G. — d—n whipping”just as he made the attack and the striking first with his fist were both but expedients to cover his real design to kill and, like that design, had been premeditated upon. It is true that this construction of this exclamation and act may be improbable and far-fetched, yet the jury, to reconcile it with the other testimony, may have given it this construction; which they had a right to do in balancing, weighing and reconciling the testimony. And besides these considerations we cannot fail to remember that the court below and jury had the advantage of receiving the evidence from the mouths of the witnesses and had the opportunity to observe their manner, tone and countenance, and therefore, from being thus in more favorable circumstances to estimate the credibility of the different parts of the testimony, could more accurately weigh it than we can. Another ground, insisted upon as a ground for the new trial applied for, is, that improper testimony was permitted to go to the jury against the objection of the prisoner interposed at the time of its production. We have closely examined all the testimony in the record in view of this ground and ñnd none improperly admitted except the single statement in Doctor Tucker’s testimony that “ Stamps picked up the gun with the intention of going home.” It was impossible that the witness could have known any thing of the intention of the deceased further than such intention might have been manifested by his expressions accompanying his acts and the circumstances connected therewith. Of all these he ought to have been permitted to testify, that the jury might form their conclusions of his intention, but he ought not to have been permitted to state, as he did, what were the intentions of the deceased, when he picked up the gun. In this therefore the court erred. And so far as this improperly admitted testimony had any legitimate bearing it was against the prisoner. It also appears from the record that the jury who tried the prisoner were sworn in a manner to fall short of the requirements of the law in cases of this kind. And this kind of defect in the swearing of the jury has been repeatedly held in this court to be error upon the ground that as the record exhibits the irregularity upon its face this court cannot, when the record is thus to the contrary, presume that the jury was in fact properly sworn, as we would do if it appeared only that the jury were sworn, or duly or properly sworn, without any thing further in any attempt to set out the substance of the oath. And consequently whenever the oath or its substance is set out in the record it must be intended that the oath thus set out was that that was actually administered. The prisoner in a capital case is certainly entitled by law to the' protection and guaranty of the jurors’ oath and whenever it is omitted wholly or in some material part the law must intend that his rights were seriously jeoparded. Patterson vs. The State, 2 Eng. 59. Bell vs. The State, 5 Eng. Sanford vs. The State, 6 Eng. We therefore think that, upon the foundation of these two errors, the prisoner is entitled upon his application for the same to a new trial of his case. We therefore reverse the judgment of the court below, award the prisoner a new trial accordingly and remand the case to be proceeded with.